UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| v. | * | |
| | * | Criminal Action No. 21-30007-MGM |
| BRIAN HOHMAN, | * | Criminal Action No. 21-30042-MGM |
| | * | |
| Defendant. | * | |

MEMORANDUM AND ORDER REGARDING
MOTION TO SUPPRESS
(Case No. 21-cr-30007 – Dkt. No. 63)
(Case No. 21-cr-30042 – Dkt. No. 55)

August 31, 2023

MASTROIANNI, U.S.D.J.

I. INTRODUCTION

Brian Hohman ("Defendant") has filed a Motion to Suppress, seeking an order suppressing the fruits of a search of his residence. He asserts, among other arguments, that the affidavit in support of the search warrant intentionally or recklessly omitted and misrepresented certain material information. Defendant therefore requests an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). For the following reasons, the court concludes Defendant has made the requisite showing to obtain a *Franks* hearing.

II. BACKGROUND[1]

1. Application for Search Warrant

---

[1] Docket entry citations refer to Case No. 21-cr-30007, unless otherwise indicated. The relevant filings pertaining to the motion to suppress are identical in Case Nos. 21-cr-30007 and 21-cr-30042.

The warrant to search Defendant's residence was authorized by a Massachusetts clerk magistrate on September 21, 2020. (Dkt. No. 63-2). The application sought permission to search 7 Lower West Road, Sandisfield, Massachusetts, for evidence relating to indecent assault and battery, secret sexual surveillance, and illegal possession of a firearm. Attached to the application was an affidavit drafted by Massachusetts State Trooper Timothy M. Murphy. (Dkt. No. 63-3). After a number of pages reciting general police observations about certain criminal behaviors, recounting Defendant's criminal history, and disclosing a prior investigation that did not result in charges against Defendant, the affiant asserted the following in his affidavit.

On September 16, 2020, the Berkshire State Police Detective Unit became aware of an allegation by Hunter Sarcia's mother that her 21-year-old son may have been sexually assaulted. Specifically, Sarcia's mother initially reported the allegation to Sandisfield Chief of Police Michael Morrison. Upon learning of the allegation, Murphy and Sergeant Thomas Forest conducted a phone interview with Sarcia the following day, which was not recorded at Sarcia's request. (*Id.* at 59). Sarcia explained he recently reunited with an old friend, Brooke Lacasse, who invited him to her friend Brian's house for dinner. Sarcia did not know Brian, later identified as Defendant, and interpreted Brooke's invitation as "somewhat of a date." At about 7:00 p.m. on September 11, 2020, Lacasse and Sarcia arrived to Defendant's residence at 7 Lower West Road in Sandisfield. Sarcia described Defendant as a "lunatic" and stated that, while he was giving Sarcia a tour of the home, Defendant "bragged to him about his sawed-off shotgun which Sarcia viewed in one of the bedrooms" and "also bragged to him about selling his prescription medications to kids." (*Id.* at 60).

Sarcia told the police investigators that Patron tequila shots were consumed while dinner was being cooked and that he believes he was drugged around that time in the kitchen. Sarcia also recalled being alone in the kitchen with Defendant at one point, around the same time. After dinner on the home's side deck, Lacasse and another dinner attendee, Dylan Dunham, went inside to do dishes,

2

leaving Sarcia alone with Defendant, who "would not shut up." (*Id.*). Sarcia then blacked out and when he came to, his pants were down and Defendant was holding his testicles and taking pictures of his genitals. Sarcia remembers saying, "What are you doing, I'm straight," to which Defendant replied, "We had a deal!" Sarcia stated he believed Lacasse drove him home that evening; he woke up in his own bed the next morning and was out of sorts for two days. Sarcia advised Trooper Murphy "that he knows his limits and did not drink to excess on the evening in question." (*Id.*). He also disclosed that he obtained an "expensive drug test kit," which yielded positive results for MDMA, Xanax, and cocaine. (*Id.*). Sarcia discarded the test kit shortly after. Sarcia also alleged he noticed a "bug" on his phone a few days after the incident, which he described as a Windows 10 app that he had not downloaded. (*Id.*).

The affidavit then stated: "While much of the information is self-corroborative within Sarcia's statement (i.e. description of suspect driveway, porch and residence), officers performed CJIS checks on Sarcia to ensure [no] history existed relative to making false reports, misleading police or perjuring himself. Sarcia's credibility was further enhanced by these records checks resulting in negative results." (*Id.* at 61). The affidavit also noted that "Sarcia was currently under electronic monitoring as part of his pretrial conditions of an unrelated offense," but did not elaborate on that offense. (*Id.*).

The remainder of the affidavit recounts Sergeant Ryan Dickinson's interviews with several family members regarding the incident. Sarcia's father told Sergeant Dickinson he received a call from his son on September 12, 2020, the morning after the incident. Sarcia told his dad he went to a house to see a girl. At some point while there, he told the girl and an "older guy" who was present that he had a "big dick" and showed it to them. When Sarcia dropped his pants, the older man "fondled his balls." (*Id.* at 62). When Sarcia again discussed the incident with his father on September 14, 2020, he stated he had been "lured" to the house by a girl, was fed dinner, and felt he had been drugged before being "molested" by the older man. (*Id.* at 62–63). On September 17, 2020, Sarcia told his father he

had a shot of tequila at the house and stated his belief he may have been drugged via the alcohol. (*Id.* at 63).

Sergeant Dickinson also spoke with Sarcia's grandmother. She relayed she took a walk with Sarcia the afternoon after the incident. During that walk, Sarcia told her he'd been invited to a dinner by a girl the night before and thought he had been drugged while there because he "woke up to find himself with an erection and an older man was leaning over him taking pictures with his phone." (*Id.*). Sarcia told his grandmother he took a drug test that morning, which returned positive results for several drugs he believed he had been given. (*Id.* at 64). Sarcia's grandmother indicated she had no further discussions with Sarcia about the incident.

In the summary of probable cause, the affidavit reiterates Sarcia's statements to investigators that: he observed a sawed-off shotgun in Defendant's home the evening of the incident; Defendant used a cell phone to photograph him; Sarcia believed his phone was "bugged"; after the alleged sexual assault, "Sarcia self-administered a drug test in which Sarcia stated the test results indicated he had tested positive for MDMA, Xanax, and Cocaine," but had disposed of the test; he advised he had "consumed Patron Tequila that night"; and "Sarcia denied knowingly taking any of those drugs or consuming enough alcohol as to make him black out." (*Id.* at 64). Based on these statements, the affidavit sought a warrant to search Defendant's home. While Murphy authored the affidavit, the matter was discussed with Detective Lieutenant Edward Culver, Sergeant Forest, Sergeant Dickinson, and a Berkshire Assistant District Attorney. The affidavit itself was reviewed by Sergeant Dickinson and Lieutenant Culver.

2. Pending Charges Against Sarcia[2]

---

[2] The information in this section is summarized from police reports and court documents submitted by Defendant in support of his *Franks* hearing request. (Dkt. No. 63).

At the time of the incident and affidavit, Sarcia had two criminal cases pending against him, the underlying facts of which were not included in the affidavit. In relevant part, at around 7:30 p.m. on September 27, 2019, Sarcia was operating a Jeep Cherokee, driving between 20-40 mph over the speed limit on Route 44 in Barkhamsted, Connecticut. As an elderly couple in a Dodge Ram pickup truck were exiting the parking lot of the Log House restaurant after having dinner there, they each looked both ways before they began pulling out of the parking lot, noting no vehicles. They were then suddenly hit by the Jeep. Both the driver and the passenger in the Dodge Ram had to be extracted using the Jaws of Life and suffered extensive injuries from the collision. When police arrived on the scene, a Connecticut State Trooper observed an open beer can in the center console of the Jeep, which contained beer. In the ambulance, another officer noted a marijuana grinder and pipe on Sarcia's person. A few days after the incident, Sarcia gave a statement to police. He indicated he was at his cabin the evening before the collision but "[did not] remember what happened." When he woke up the next morning, he weed whacked the property, stole two beers from his dad, drank them both, and then smoked marijuana. He could not recall how much. He then went to a friend's house, smoked more marijuana, and "the next thing I remember was waking up in the LifeStar helicopter" after the collision. (Dkt. No. 63-4).

Sarcia's then-girlfriend, Sarah Turick, also gave a statement to police. She explained Sarcia had come to her apartment the evening of the incident at around 7:00 p.m. to talk about their relationship. When he arrived, he parked his Jeep in a manner that concerned her and both she and a neighbor commented that he was driving recklessly. Turick got in Sarcia's vehicle and he drove to a nearby pub and parked. She stated Sarcia was "acting strangely" so she asked him "what he was on." He said he "drank a couple of beers earlier, but he 'danced' around the subject." Turick immediately asked him to take her home because "he was making me nervous because [she didn't] know what he was on."

Sarcia then brought her back to her apartment complex and, according to Turick, was again "driving recklessly." (*Id.*).

Based on blood samples taken while Sarcia was in the hospital, Connecticut State Police determined his blood alcohol level was 0.13% and also contained marijuana. In June 2020, Sarcia was charged with two counts of assault in the second degree by motor vehicle; drinking while driving; use of a drug, less than half an ounce; possession of alcohol by a minor; reckless driving; and driving under the influence by a person under the age of 21. (Dkt. No. 63-6). On June 26, 2020, he was released on bond with conditions, including not to possess or consume alcohol or illicit substances and to take medications as prescribed and directed. (*Id.*). The case remained pending at the time of the September 2020 incident and affidavit seeking a search warrant for Defendant's residence.

The second charge stemmed from an incident in the early morning hours on June 13, 2020. At approximately 11:00 p.m. the night before, Sarcia had arrived home intoxicated. He and his girlfriend, Turick, who at this point were living together, began to argue in their bedroom. As the argument escalated, Turick told Sarcia she was thinking of moving out and Sarcia became belligerent and "enraged." He would not let her leave, grabbed her by the arms, and when she pinched him in an attempt to get him to let go, he began punching her in the head and pushed her head into the headboard. Sarcia then threw Turick on the bed, got on top of her, "shoved his hand down her throat" until she coughed up blood, and smashed her phone when she tried to call the police. When she tried to crawl out the window, Sarcia pulled her back in, smashed her head into the floor, threatened to kill her, and began strangling her with his hands around her neck. He then became very apologetic and made her sit with him on the deck while he called police with a knife to his neck. (Dkt. Nos. 63-7 & 63-8). Around 1:00 a.m., Massachusetts State Trooper Nicholas Maratea received the call to respond to a domestic violence disturbance in progress. Dispatch advised that Sarcia had called and advised he

was involved in an incident with his girlfriend, he was still with her, and that he was "heavily armed" with "all kinds of weapons." He warned police not to come.

Sandisfield Police Chief Michael Morrison arrived to the scene first. Sarcia was holding a knife to his throat and threatening to kill himself. Chief Morrison was able to verbally disarm Sarcia and secure Turick. After Chief Morrison disarmed him, Sarcia somehow was able to get into his vehicle and flee the scene, driving toward Connecticut. When Trooper Maratea arrived to the scene, Turick was sitting in Chief Morrison's vehicle and was visibly shaken. Sergeant Doktor and Trooper Kane also responded to the scene. Turick was transported to the hospital, provided a police statement, and obtained a restraining order against Sarcia. (Dkt. No. 63-7). Later in the evening on June 13, 2020, Massachusetts State Trooper Elliot Scibelli returned to the address and, with the assistance of Trooper Edward Brunton, placed Sarcia under arrest. (Dkt. Nos. 63-9 & 63-10).

Sarcia was charged with assault and battery on a family or household member; strangulation or suffocation; kidnapping; malicious destruction of property; and witness intimidation. (Dkt. No. 63-11). As one of his conditions of release, the court ordered Sarcia be subject to GPS monitoring. (Dkt. No. 63-13). The case remained pending at the time of the September 2020 incident and affidavit seeking a search warrant for Defendant's residence.

3. Search of Defendant's Home and Subsequent Searches

After the application for a search warrant of Defendant's home was granted, Massachusetts police executed a search of the home on September 23, 2020. Police seized an Android smart phone; a game camera with an SD card; a Harrington & Richardson shotgun; a 16 gauge shotgun shell; a plastic bag with 2.5 pills inside; various prescription pills; a green bag with assorted items used to cause sleep; two Patron tequila bottles; a MacBook laptop; and a black and white composition book. (Dkt. No. 63-16). The seizure of the shotgun underlies the firearm possession charge in Case No. 21-cr-30007. After an October 2020 arrest and while subject to pretrial detention in Connecticut on charges

of stalking a 15-year-old boy in a separate incident, Defendant spoke with Lacasse on a recorded phone line in the correctional facility. As a result of statements made during that call, Connecticut police obtained several subsequent warrants, which led to discovery of the videos and images underlying the child pornography charges in Case No. 21-cr-30042. In support of those subsequent search warrants, the affiants referred to the allegations made by Sarcia as well as the items seized and/or observed by the Massachusetts officers during the initial search of Defendant's residence.

### III. STANDARD OF REVIEW

"Under *Franks*, 438 U.S. at 155, a defendant may request an evidentiary hearing to challenge the truthfulness of statements made by law enforcement agents in a search warrant affidavit." *United States v. Hicks*, 575 F.3d 130, 138 (1st Cir. 2009). "To obtain a *Franks* hearing, a defendant must make 'a substantial preliminary showing' that: 1) the warrant affidavit contains a false statement made 'knowingly and intentionally, or with reckless disregard for the truth,' and 2) that 'the allegedly false statement was necessary to the finding of probable cause.'" *Id.* (quoting *Franks*, 438 U.S. at 155-56) (internal citations omitted); *see also United States v. Tanguay*, 787 F.3d 44, 49 (1st Cir. 2015) (explaining that, as to material omissions, "first, the omission must have been either intentional or reckless; and second, the omitted information, if incorporated into the affidavit, must be sufficient to vitiate probable cause."). "Recklessness may be inferred from circumstances evincing obvious reasons to doubt the veracity of the allegations." *United States v. Arias*, 848 F.3d 504, 511 (1st Cir. 2017) (quoting *United States v. Ranney*, 298 F.3d 74, 78 (1st Cir. 2002)). Moreover, "[i]n the case of allegedly material omissions, recklessness may be inferred where the omitted information was critical to the probable cause determination." *United States v. Gifford*, 727 F.3d 92, 98-99 (1st Cir. 2013) (quoting *Burke v. Town of Walpole*, 405 F.3d 66, 81-82 (1st Cir. 2005)).

"A warrant application must demonstrate probable cause to believe that (1) a crime has been committed—the 'commission' element, and (2) enumerated evidence of the offense will be found at

the place searched—the so-called 'nexus' element." *United States v. Dixon*, 787 F.3d 55, 59 (1st Cir. 2015) (quoting *United States v. Feliz*, 182 F.3d 82, 86 (1st Cir. 1999)). As to the nexus element, the question is "whether, given all the circumstances set forth in the affidavit . . . , there exists a 'fair probability' evidence will be found in the place to be searched." *United States v. Roman*, 942 F.3d 43, 50 (1st Cir. 2019) (quoting *United States v. Feliz*, 182 F.3d 82, 86 (1st Cir. 2015); *see also Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978) ("The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought."). Moreover, the home in particular is entitled to "the highest level of Fourth Amendment protection," *Morse v. Cloutier*, 869 F.3d 16, 23 (1st Cir. 2017) (quoting *Matalon v. Hynnes*, 806 F.3d 627, 633 (1st Cir. 2015)), as "the 'very core' of the Fourth Amendment is to be 'free from unreasonable governmental intrusion' into one's home," *Roman*, 942 F.3d at 50 (quoting *Florida v. Jardines*, 569 U.S. 1, 6 (2013)).

## IV. ANALYSIS

Defendant asserts the affidavit here contains material omissions related to Sarcia and his reliability. Specifically, Defendant argues the affiant, Trooper Murphy, failed to disclose to the magistrate information directly or constructively known to him and other investigating law enforcement personnel regarding the Sarcia's alcohol and drug abuse, mental health concerns and use of prescription medication, and instances of misleading the police and/or violating court orders. The government, in response, argues Defendant has not made a sufficient showing to obtain a *Franks* hearing. The court will address the *Franks* issue first, because any reformation of the affidavit as a result of a *Franks* hearing will "necessarily affect[] the four-corners analysis as to whether the affidavit established probable cause to search the residence." *United States v. Roman*, 327 F. Supp. 3d 312, 323 (D. Mass. 2018), aff'd, 942 F.3d 43 (1st Cir. 2019); *United States v. Roman*, 2017 WL 4517963, at *1 n.1 (D. Mass. Oct. 10, 2017) (citing *United States v. Fleury*, 842 F.3d 774, 778 (1st Cir. 2016)).

The court begins with the second prong of the *Franks* analysis: whether Defendant has made a substantial preliminary showing that the omissions would be sufficient to vitiate the probable cause determination. Upon careful consideration of the affidavit and the omitted information underlying Sarcia's pending charges, the court concludes Defendant has satisfied this showing. The court notes at the outset that the affidavit as submitted—without considering the alleged misrepresentations or omissions—did not make a strong probable cause showing to begin with.[3] The affidavit purports to establish probable cause based solely on Sarcia's allegations; Sarcia's credibility and reliability are, thus, paramount. His sexual assault allegations against Defendant were predicated on his assertion that he blacked out and believes he was involuntarily drugged because "he knows his limits and did not drink to excess on the evening in question." However, this representation is severely undermined by the fact that, during both incidents leading to his pending charges, Sarcia consumed to the point of extreme intoxication, including to the point of blacking out and not being able to recall the amount of drugs and/or alcohol consumed. Likewise, the incidents highlight Sarcia's mental health struggles, including observations that he behaves "strangely" and becomes "belligerent" when intoxicated, which are plainly pertinent to Sarcia's reliability under the facts in this case. While his statement suggests he saw the shotgun in Defendant's home before he was under the influence, there is no detail at all describing the gun, its location within an undescribed bedroom, nor the distance or duration of the observation.

Moreover, the affidavit contended Sarcia's credibility was "further enhanced" by a lack of any reports that he had misled police or perjured himself. But Sarcia's history relating to the two pending

---

[3] The court emphasizes that at this stage—in deciding whether Defendant has met his burden to obtain a *Franks* hearing—it need not, and does not, decide whether the affidavit *as submitted* established probable cause. The court merely highlights the weak showing of the original affidavit as relevant to the question of whether the affidavit, as reformed to include all material misrepresentations or omissions, lacks probable cause.

If Defendant demonstrates intentionality or recklessness as to some omissions but not others, the court's probable cause analysis may be subject to change, as the reformed affidavit would have to be considered accordingly. In the event Defendant does not demonstrate at least recklessness at the *Franks* hearing, then the court will conduct a four-corners analysis of the affidavit as submitted to the magistrate.

cases makes clear that he had, in fact, previously provided incorrect information to police and flouted law enforcement and court authority in serious ways. During the strangulation incident, Sarcia claimed to law enforcement to have "all kinds of weapons" and that he was "heavily armed." When police arrived to the scene, however, Sarcia had only a knife. While the government downplays this discrepancy, the fact that Sarcia previously overstated the presence of weapons when intoxicated is patently relevant to the reliability of his assertion he saw a firearm at Defendant's home the night he both admits he consumed alcohol and states he blacked out. Moreover, the discrepancy directly contradicts the affidavit's representation that Sarcia had no history of misleading police. Nor was that the only way in which Sarcia had impeded police efforts. After the strangulation incident, for example, he fled the scene while officers made sure Turick was safe and secured.

On several occasions, Sarcia also violated the conditions of release of his Connecticut collision case. Of particular relevance to the allegations giving rise to the search warrant in this case, Sarcia admitted he drank alcohol at Defendant's home, but he represented to investigators he drank only a minimal amount. Sarcia knew the use of alcohol or drugs violated his conditions of release. It is apparent that any information suggesting Sarcia had a potential motive to lie about the amount of alcohol he consumed or the presence of any other substances found in his system would have weakened the reliability of his allegations.

The government insists that Sarcia's account is nevertheless reliable because it is corroborated by extrinsic evidence in the form of GPS monitoring and an accurate description of Defendant's home. But as Defendant points out, the affidavit was required to establish more than Sarcia's mere presence at Defendant's home; it needed to establish probable cause that evidence of a crime would be found there—in this case, evidence of indecent assault and battery, secret sexual surveillance, and unlawful possession of a firearm. The court fails to see how a truthful report that Sarcia simply went to the residence inherently corroborates allegations regarding involuntary drugging, sexual assault, and

weapons to such an extent that omitted information regarding Sarcia's substance abuse and pending charges would have no bearing on his reliability or, in turn, a finding of probable cause.

The government also argues the omissions would not have undermined probable cause because Sarcia's police statement was consistent in some respects with another recent report by a different young adult male regarding uncomfortable encounters he had with Defendant. That report, recounted in the affidavit, resulted in no actionable intelligence. But the prior allegation referred to in the affidavit is notably different from Sarcia's; it did not involve nonconsensual sexual conduct or involuntary substance consumption. To the contrary, that man described the sexual activity with Defendant as fully consensual and stated the reason he was "draw[n]" to Defendant's home was to engage in the "legal consumption of marijuana," which Defendant "allowed [him] to smoke in the house." To the extent Sarcia's statement is "consistent" with the prior encounter in any relevant manner, it is for the limited proposition that Defendant invites young adult men to his home, furnishes them voluntarily-consumed alcohol or other substances, and seeks to engage in consensual sexual conduct with them. Such consistencies do not establish probable cause for indecent assault and battery nor for secret sexual surveillance. Indeed, in this court's view, the *inconsistencies* with the prior allegation are more significant, especially when considered in light of the omissions at issue here regarding Sarcia's history of substance abuse, misleading police, and violating conditions of release, including the condition to refrain from consuming any alcohol or illicit drugs.

Nor do Sarcia's statements to family members sufficiently rehabilitate his reliability. He initially told his father he voluntarily "dropped his pants" and showed Lacasse and Defendant his genitalia of his own accord. Thus, Sarcia first reported to his father that he did in fact recall the events immediately preceding the alleged assault, which directly conflicts with his police statement that he blacked out prior to the incident. His initial discussion with his father also indicates he voluntarily removed his pants from his waist and was fondled while displaying his genitals. This description of events appears

12

to conflict with the strong implication in his police statement that Defendant surreptitiously drugged Sarcia and then removed his pants after he was incapacitated. In addition, unexplained inconsistencies, gaps, and oddities linger amidst Sarcia's various statements. For example, he told investigators he was "out of sorts for two days" after the alleged incident, but he somehow obtained an "expensive drug test kit" and self-administered it the next morning before discarding the results, visiting his grandmother, and socializing with friends. The affidavit contains no information to apprise a reviewing magistrate as to whether any such "expensive drug test kits" are available on the market for purchase by the general public; how or when Sarcia obtained one despite stating he was "out of sorts" and had no vehicle at the time; or whether any attempt was made to recover the discarded test results or administer another test to detect substances in the system. Similarly, Sarcia mentions a "bug" on his phone in the form of a Windows 10 app, a piece of information which investigators cited to justify a search of Defendant's electronic devices for evidence of a Windows 10 operating system. However, the affidavit indicates no attempt to corroborate the presence or even the actual existence of such a Windows 10 app. There was no effort to determine its date of installation, identify the specific app, or determine whether such an app could in fact be used as a "bug" to remotely surveil a cell phone. That the affidavit reveals no effort to explain, corroborate, or even, it seems, investigate Sarcia's peculiar claims about an at-home, expensive drug test and Windows 10 "bug" on his phone is itself troubling—and a striking example of the paucity of probable cause in the affidavit as submitted. But more importantly, in the absence of any extrinsic corroboration of these assertions, Sarcia's history of severe substance abuse, mental health concerns, and erratic behavior while intoxicated casts a serious shadow on such unsubstantiated allegations, further eroding the reformed affidavit's proffer of probable cause.

In sum, under the circumstances in this case, the omitted material sows substantial doubt as to Sarcia's reliability and would have certainly undermined the probable cause finding. When the

13

affidavit is reformed to include all of the omissions regarding the circumstances that led to Sarcia's pending charges, it becomes clear that his credibility issues present an insurmountable hurdle to a finding of probable cause premised solely on his statements. This is especially so where, as here, the complainant does not merely suffer from general credibility concerns; rather, Sarcia's credibility issues are directly pertinent to the specific allegations he made. While a fully reformed affidavit no doubt generates suspicion about Defendant's activities, the court concludes it would not meet the legal standard of probable cause.

The court now turns to the question of whether Defendant has made a substantial preliminary showing that Trooper Murphy intentionally or recklessly omitted the material information from the affidavit. At the outset, it bears mention that the law enforcement community was clearly aware of and concerned about Defendant's activities and alarming criminal history. When presented with allegations of illegal activity against Defendant, it appears officers jumped on the lead and hurried their way to a warrant. But such concern, even if justified, does not give license to selectively obscure, fail to investigate, or exclude information from a warrant application that may "tip the balance away from a finding of probable cause." *United States v. Stewart*, 337 F.3d 103, 107 (1st Cir. 2003).[4] Although "[t]he probable cause standard 'is not a high bar,'" *United States v. Adams*, 971 F.3d 22, 32 (1st Cir. 2020) (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)), it "cannot be based on conclusory statements, or mere 'suspicion, rumor, or strong reason to suspect [wrongdoing],'" *United States v. Samboy*, 433 F.3d 154, 159 (1st Cir. 2005) (quoting *United States v. Vigeant,* 176 F.3d 565, 569 (1st Cir.1999)). Nor

---

[4] As the First Circuit has cautioned:

> Meticulous compliance [with the Fourth Amendment] involves more than an agent's own judgment as to the ultimate importance of a piece of information to a judgment of probable cause. The agent also should, in the interest of both judicial economy and fairness, ask the further question, "Is this information so trivial, remote or irrelevant that no reasonable official could assign it weight in coming to a decision to issue the warrant?" Unless an affirmative answer can be given, the information should be included[.]

*Stewart*, 337 F.3d at 107.

does the Fourth Amendment permit investigators to sanitize information to support a search warrant, either intentionally or recklessly, or turn a blind eye to qualms about a source's information or reliability in order to scrounge up probable cause to target a suspicious individual already on their radar. While investigators need not exhaust every possible lead, an officer may have a duty to investigate a matter further before presenting a warrant application to a judge where circumstances evince "obvious reasons" to doubt the veracity of the allegations or the credibility of the person making the allegations. *United States v. Barbosa*, 896 F.3d 60, 71 (1st Cir. 2018) (citing *Tanguay*, 787 F.3d at 52–54).

Upon careful review, the court concludes Defendant has made a sufficient preliminary showing of at least recklessness. The government argues "Defendant has made no showing Trooper Murphy had any knowledge of those facts [underlying Sarcia's open charges] at the time he signed the Murphy Affidavit." (Dkt. No. 71 at 10). But a substantial preliminary showing does not require "clear proof." *United States v. Williams*, 477 F.3d 554, 558 (8th Cir. 2007); *United States v. Brown*, 298 F.3d 392, 408 (5th Cir. 2002); *United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1111 (9th Cir. 2005). Here, the affiant went out of his way to bolster Sarcia's credibility by stating that a criminal records check revealed no instances of false reports, misleading police, or perjury. Indeed, the affidavit avers that Trooper Murphy conducted a CJIS inquiry of Sarcia and discloses that he knew "Sarcia was currently under electronic monitoring as part of his pretrial conditions of an unrelated offense." These averments themselves give rise to an inference that Trooper Murphy knew Sarcia had been charged with several crimes, the first group of which facially involved excessive consumption of alcohol and other drugs, leading to a serious car accident. Given Sarcia's allegation that he blacked out but that he "knew his limits" and "did not drink to excess" the evening of the incident in Defendant's home, such charges should have given Trooper Murphy pause about the reliability of Sarcia's statements and therefore could have triggered a duty of further inquiry to uncover the underlying facts of those pending charges.

The court also notes its analysis of intentional or reckless conduct is not confined only to the affiant; it may include other government agents as well. "The vast majority of courts recognize the *Franks* inquiry should not focus solely on the affiant, because "a different rule would permit government officials deliberately to keep from affiants or the court information material to the determination of probable cause and by such conduct avoid the necessity of a *Franks* hearing." *United States v. Roman*, 311 F. Supp. 3d 427, 435 (D. Mass. 2018) (collecting cases). Accordingly, the court's inquiry extends to information that may have been known to other officers involved in the investigation, including Lieutenant Culver, Sergeant Forest, Sergeant Dickinson, Sandisfield Chief of Police Morrison, and the assistant district attorney. The affidavit and exhibits proffered by Defendant reveal that Trooper Murphy was transferred from the Lee State Police Barracks to the Berkshire State Police Detective Unit sometime in June 2020, the same month other officers at the Lee Barracks responded to a domestic violence call involving Sarcia, which involved misleading statements to police and intoxication. Indeed, the Sandisfield Chief of Police Michael Morrison was both the first responder on scene in the strangulation case and the officer who first relayed the report of sexual assault by Sarcia's mother to the Berkshire State Police Detective Unit for further investigation, though it is unclear if he knew the circumstances or precise allegations surrounding the sexual assault. Plainly, Chief Morrison was aware of the pending charge against Sarcia and the underlying facts thereto at the time he relayed the possible sexual assault report. Given these circumstances, the court finds Defendant has made the requisite substantial preliminary showing that the affiant recklessly omitted from the affidavit information severely undermining Sarcia's reliability that he either knew or should have undertaken further inquiry to uncover.

Defendant still faces a difficult task. He must still prove that the misrepresentations or omissions—assuming they occurred—were done either intentionally or with reckless disregard for the truth. If he succeeds in that showing, however, the usual deference accorded the issuing magistrate's

16

decision to approve the warrant would not apply,[5] and the court is prepared to say—at this preliminary stage—that probable cause would be absent if all of the omitted information were considered. *See Roman*, 942 F.3d at 50 ("[W]hile reviewing courts generally afford substantial deference to a magistrate's determination of probable cause, where '[a]llegations of intentional or reckless misstatements or omissions' are proven true, we owe 'no deference to a magistrate's decision' because this '"implicate[s] the very truthfulness, not just the sufficiency, of a warrant application."' (quoting *Burke v. Town of Walpole*, 405 F.3d 66, 82 (1st Cir. 2005)). Defendant, the court finds, is entitled to attempt to make that showing at a *Franks* hearing.

## V. CONCLUSION

For the foregoing reasons, the court ORDERS that a *Franks* hearing be held consistent with this decision.

                                                         /s/ Mark G. Mastroianni  
                                                         MARK G. MASTROIANNI  
                                                         United States District Judge

---

[5] In addition, if Defendant satisfies his burden at the *Franks* hearing, the good-faith exception likely would not apply either. *See Roman*, 327 F. Supp. 3d at 327–28.